931 A.2d 1123

**Irfan ALEEM**

v.

**Farah ALEEM.**

**No. 1366 Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 10, 2007.

**664**

Stephen J. Cullen (Jeffrey M. Geller, Miles & Stockbridge, PC, on the brief), Towson, MD, for Appellant.

Susan M. Friedman (Kuder, Smollar & Friedman, PC, on the brief), Washington, DC, for Appellee.

Panel: HOLLANDER, ADKINS and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY, Judge (retired, specially assigned).

The appellant, Irfan Aleem (Husband), and the appellee, Farah Aleem (Wife), are nationals of the Islamic Republic of Pakistan. While Wife was suing Husband for divorce in the Circuit Court for Montgomery County, Husband divorced Wife by *talaq*, in accordance with Pakistani law. The controversy before us concerns the Maryland court's equitable division of marital property in the form of Husband's pension. Husband is aggrieved because the Maryland court did not give comity to Pakistani law under which his divorce by *talaq* did not include any equitable division of marital property titled in his name.

The Pakistani law of divorce was succinctly described by the House of Lords in *In re Fatima*, [1986] 2 W.L.R. 693, [1986] 2 All E.R. 32, [1986] A.C. 527, 1996 WL 406815(HL). There, the entire court joined in the opinion ("speech") of Lord Ackner, who said:

"In Pakistan the law relating to divorce is the Islamic law as modified by the Muslim Family Laws Ordinance 1961. In traditional Islamic law the husband has the right unilaterally to repudiate his wife, without showing cause and without recourse to a court of law. Such divorce is effected by the announcement of the formula of repudiation, a talaq, and in traditional law a divorce by talaq would take the simple form of the husband announcing talaq three times. The divorce then becomes immediately effective and irrevocable. Such a form of talaq has been called 'a bare talaq.' Although it is still effective in some countries, for example, Dubai, section 7 of the Ordinance provides:

" '(1) Any man who wishes to divorce his wife shall, as soon as may be after the pronouncement of talaq in any form whatsoever, give the chairman notice in writing of his having done so, and shall supply a copy thereof to the wife. (2) Whoever contravenes the provisions of subsection (1) shall be punishable with simple imprisonment for a term which may extend to one year or with fine which may extend to 5,000 rupees or with both. (3) Save as provided in subsection (5), a talaq unless revoked earlier, expressly or otherwise, shall not be effective until the expiration of 90 days from the day on which notice under subsection (1) is delivered to the chairman. (4) Within 30 days of the receipt of notice under subsection (1), the chairman shall constitute an arbitration council for the purpose of bringing about a reconciliation between the parties, and the arbitration council shall take all steps necessary to bring about such reconciliation. (5) If the wife be pregnant at the time talaq is pronounced talaq shall not be effective until the period mentioned in subsection (3) or the pregnancy, whichever be later, ends. (6) Nothing shall debar a wife whose marriage has been terminated by talaq effective under this section from remarrying the same husband, without an intervening marriage with a third person, unless such termination is for the third time so effective.'

" 'The chairman' refers to the chairman of the relevant local union council in Pakistan. Although he is required to convene an arbitration council to attempt the reconciliation of the parties, their attendance is not obligatory and the divorce will become effective, unless the wife is pregnant, once 90 days have elapsed from the date on which the chairman received notice of the talaq."

[1986] A.C. at 531–32.

The background facts of this case are succinctly presented in the memorandum opinion of the circuit court (Pincus, J.).

"The parties were married on July 16, 1980 in Karachi, Pakistan after their families arranged their meeting. [Wife] was 18 years old and [Husband] was 29 years old. [Wife] had just finished high school and [Husband] was about to begin his doctoral studies at Oxford University in England.[1] A few weeks after the marriage, [Husband] moved to England. The parties never lived together in Pakistan. [Wife] eventually joined [Husband] in England and the two lived there together for four years. When [Husband] completed his studies, the parties moved to the United States. They have been living in Maryland for over twenty years. They have two children together, Zeeshan, born September 22, 1985 and Zoya, born September 12, 1988. Zeeshan is in college at George Washington University and Zoya is about to begin her senior year of high school in Washington, DC. Both children were born in the United States and are U.S. citizens.

"[Wife] is 43 years old. She earned her high school diploma in Pakistan. Initially, she intended to study medicine immediately, however she was unable [to] attain placement in the local medical program. She had some educational training in England. After she moved to the United States, she began taking courses at Montgomery College in Maryland and later at American University in Washington, D.C. To date, she has earned 60 credits to-

---

**1.** Husband holds a Ph.D. in economics. His expertise is the development of the economies of Third World countries.

wards a bachelor's degree. She indicated a strong desire to complete her degree.

"During the marriage, [Wife] was a homemaker. Her responsibilities included caring for the children, the household, and [Husband]. [Husband] was employed at the World Bank during the marriage, from 1985 until his retirement in 2004. Due to her immigration status, [Wife's] ability to obtain employment was severely limited. World Bank and immigration policies required [Wife] to get [Husband's] written permission before she could secure employment. [Husband] agreed to sign a work permit, and [Wife] began to work for Executive Office Suites in Virginia. She worked there for four and half years. [Wife's] immigration status has recently changed and she obtained her Green Card in January 2006. She is now a permanent resident of Maryland and she has no restrictions on employment. She currently works for Profitable Association in Washington, D.C. where she earns $2,894 net per month. She is responsible for her own medical insurance."

This litigation was commenced by Wife's bill of complaint filed March 3, 2003, which sought a limited divorce. Husband answered and counterclaimed. The answer did not raise any jurisdictional issues. After numerous motions and hearings, the court, on October 31, 2003, ordered Husband to vacate the family home, and on November 20, 2003, the court entered judgment against the Husband in the amount of $10,800 for arrearage in *pendente lite* child support. That judgment was marked satisfied in January 2004. In February, Wife amended her complaint to seek an absolute divorce. On April 5, 2004, Husband moved to dismiss the divorce action on the ground that "all issues have already been decided in Pakistan[.]"[2] (Capitalization and bold type altered). Exhibits attached to that motion reflect what had transpired while the Maryland action was pending. The parties' marriage was pursuant to a contract, more fully described *infra*, which

---

2. The motion was filed by counsel who is not the counsel appearing for Husband in this appeal.

called for a deferred dowry of 51,000 Pakistani rupees, which Husband converts to $2,500 (U.S.).

The motion further informed the court that, four months after the divorce action was filed in Montgomery County, Husband presented at the Pakistani Embassy in Washington, D.C. There, before two witnesses, he signed and had notarized a "Divorce Deed," which in relevant part reads:

"Now this deed witnesses that I the said Irfan Aleem, do hereby divorce Farah Aleem, daughter of Mahmood Mirza, by pronouncing upon her Divorce/Talaq three times irrevocably and by severing all connections of husband and wife with her forever and for good.

"1.   I Divorce thee Farah Aleem.

"2.   I Divorce thee Farah Aleem.

"3.   I Divorce thee Farah Aleem."

On July 23, 2003, a private process server served Wife with the "Divorce Decree [Deed]," a check for $2,500, and a letter from Husband concerning notice under § 7.1 of the Muslim Family Laws Ordinance (Pakistan) 1961.[3]  Also attached as an exhibit to Husband's motion was a copy of a letter from the Chairman, Arbitration Council, Cantonment Board Clifton, Karachi, to Wife's counsel.  It responded to counsel's request that Husband's "application" be denied, because an action had already been filed in the jurisdiction in which the parties resided and owned property, and in which their children had been born and raised.  The Cantonment Board Chairman stated that the parties were Pakistani citizens who had been married in Pakistan, so that his "Union Council" had jurisdiction.  He advised that "[t]he purpose of notices is to ascertain whether both parties want to reconcile in which case the divorce shall not become final."  The Chairman pointed out that three notices had been sent to Wife and to Husband.

---

**3.**   As set forth above, § 7, headed, "Talaq," subsection (1) provides:

"Any man who wishes to divorce his wife shall, as soon as may be after the pronouncement of talaq in any form whatsoever, give the chairman a notice in writing of his having done so, and shall supply a copy thereof to the wife."

The latter had replied by disclaiming any desire to reconcile. The Chairman's letter concluded: "It may also be mentioned that [the] function of the Arbitration Council is only to see whether both husband and wife want to reconcile and live again as husband and wife." The Cantonment Board Chairman's "Confirmation Certificate of Divorce," dated February 26, 2004, was also exhibited by Husband to the Montgomery County court in support of dismissal of Wife's divorce action.

Husband's position as to the legal effect of the above-described exhibits was presented in an affidavit of Ahsan Zahir Rizvi, an apparently highly regarded Pakistani lawyer. He affirmed that, under Pakistani law, the *talaq* pronounced by Husband on June 30, 2003, became effective ninety days after notice had been delivered to the "officer appointed for receiving the same." [4]

With respect to property disposition on divorce under Pakistani law, that expert witness tendered by Husband would have opined:

"5. Under Pakistan law, a division of the properties, consequent upon termination of the marriage, takes place *ipso facto* upon such termination in the following manner:

"a) All property owned by the husband on the date of such termination of marriage remains the husband's property and the wife has [no] claim thereto.

---

**4.** The expert's affidavit, in an apparent conflict with the foregoing statement, additionally affirmed that

"[t]he Shariat Appellate Bench of the Supreme Court of Pakistan has laid down the law that even in the absence of such notice the marriage of a citizen of Pakistan, wherever resident, would stand terminated on the date on which the declaration of divorce was made by the husband and communicated to the wife. Under Article 189 of the Constitution of the Islamic Republic of Pakistan, 1973, such decision of the Supreme Court of Pakistan is binding on all Courts in Pakistan."

Any difference in the effective date under Pakistani law of the Pakistani divorce is immaterial to the issues before us.

"b) All property owned by the wife on the date of termination of the marriage remains the wife's property and the husband has no claim thereto."

Husband's motion to dismiss was heard on April 23, 2004, the first day of the first of three trials in this matter. The court (Sundt, J.) denied the motion. In explanation of her ruling, she said:

"The idea that in this case Mr. Aleem can apply for and on the basis of his declaration receive a divorce offends the notions of this Court in terms of how a divorce is granted. I am not, as a member of this bench, going to give comity to such an award."

The first trial terminated with a dismissal of the claim for divorce, without prejudice and with leave to amend, because Wife had not established the requisite duration of a voluntary separation as ground for an absolute divorce. At that trial, Husband was represented by the attorney who had moved to dismiss.

At the second trial, on November 21, 2005, Husband appeared pro se. He submitted that the court was required to hold an evidentiary hearing on issues of comity under *Hosain v. Malik*, 108 Md.App. 284, 671 A.2d 988 (1996), discussed *infra*. The court (Sundt, J.) considered that the submission requested reconsideration of its previous determination. The court stood by its prior decision, *i.e.*, "[t]hat the Pakistani divorce is not being given comity." That second trial also ended in a dismissal without prejudice, based on the lack of testimony as to the grounds for divorce and as to corroboration.

Husband, acting pro se and "in the spirit of justice," moved on March 9, 2006, for a "clarification from Judge Sundt on the possibility of judicial error underlying the court's decision not to grant comity to Pakistani divorce." (Capitalization and bold type altered). He again relied on *Hosain v. Malik*, *supra*. The court (Sundt, J.) denied that motion by an order signed June 6 and docketed June 27, 2006.

Trial number three, at which Husband again appeared pro se, commenced June 7, 2006. During that trial, on June 9, 2006, Husband complained that he had not received a ruling on his motion filed March 9, 2006, and he again began to argue that he should have been allowed an evidentiary hearing on Pakistani law. The court (Pincus, J.) pointed out that Husband should withhold his argument until closing.

For the reasons stated in a memorandum opinion, the court entered a judgment granting Wife an absolute divorce, on the ground of a two-year separation, and the court signed an amended order for spousal support, docketed June 29, 2006. That order directed Husband to pay to Wife, until the death of either party, fifty percent of Husband's monthly benefit from the Staff Retirement Plan of the International Bank for Reconstruction and Development.[5]

In response to the court's judgment, Husband moved to alter or amend it.[6] That motion, *inter alia*, submitted that, "by virtue of the [marriage] contract in question and Pakistani law as it applies to that contract, [Wife] is not entitled to any portion of his pension and he should be allowed to introduce evidence and expert testimony to that effect." In support, Husband refiled the affidavit of Pakistani-lawyer Ahsan Zahir Rizvi. To his memorandum responding to Wife's opposition to the motion to alter the judgment, Husband attached the affidavit of another Pakistani attorney, Tasawur Ali Hashmi, whom Husband tendered as an expert. That affidavit identified the marriage contract between the parties as a *Nikah Nama*. He said that it is "ordinarily executed in a standardized form," and that *"[t]he terms of the contract are supplied by operation of Pakistani laws which govern the Nikah Nama and the marriage."* (Emphasis added). He enumerated the remedies available to a wife in divorce under Pakistan law, and

---

5. The payment ordered by the court was couched as an order for spousal support in order to conform to regulations of the former employer. All of Husband's employment by the bank had been during the marriage, so that the marital share of his pension was 100%.

6. This motion was filed by counsel, who is not counsel on this appeal.

he opined that a wife cannot make a claim to "[m]oney, property or assets titled in the name of the husband on the date of the divorce—these remain the property of the husband and the wife has no claim to them *except* her claim to the amount/property/assets mentioned in the contract[.]" Because the pension is an asset of the pensioner, a wife does not have any right to a husband's pension, in whole or in part, "unless the *Nikah Nama* expressly provides for it."

The motion to alter was denied, and Husband noted this appeal. He presents two questions for review:

"1. Whether The Trial Court Erred In Failing to Hold an Evidentiary Hearing to Determine If the Parties' Pakistani Divorce Should be Granted Comity.

"2. Whether The Trial Court Erred In Refusing to Grant Comity to a Pakistani Divorce."

Additional facts will be stated in the discussion of the issues.

## I

Husband contends that the Montgomery County court was required to receive evidence, via live testimony or deposition, in explanation of Pakistani law as it relates to the divorce by *talaq* obtained by him. As authority for this contention, he cites cases decided in this country, dealing with judgments rendered by courts in foreign countries. Here, although it appears that the Pakistani divorce was non-judicial, see Note, *United States Recognition of Foreign, Nonjudicial Divorces,* 53 Minn. L.Rev. 612 (1969), we shall assume that the applicable law is that concerning recognition of judgments rendered by courts in foreign countries.

The litigation receiving principal emphasis by Husband is that reported in *Malik v. Malik,* 99 Md.App. 521, 638 A.2d 1184 (1994) (*Malik I*), and *Hosain v. Malik,* 108 Md.App. 284, 671 A.2d 988 (1996) (*Malik II*). The holdings of these cases, however, do not require that formal evidence of Pakistani law be admitted in the instant matter, as a preliminary to determining whether comity should b e accorded the Pakistani divorce or its consequences under Pakistani law.

The *Malik* litigation was a child custody dispute. The parents, both citizens of Pakistan, were married in 1982. Their child was born in that country in 1983, where the family lived together until September 1990, when the mother moved to her parents' home, also in Pakistan, and took the child with her. The father sued for custody in a Pakistani judicial proceeding in which the wife was represented by counsel but in which she did not personally participate. After the Pakistani court awarded custody to the father, he spent two years trying to locate mother and child. They were found in Baltimore County. When the father sought enforcement of the Pakistani judgment in the Circuit Court for Baltimore County, that court concluded that it had jurisdiction, but refused to enforce the order for lack of comity. *Malik I*, 99 Md.App. at 523–24, 638 A.2d at 1185–86. The reported opinion does not reflect whether, or, if so, how and to what extent, either party sought to present Pakistani law to the circuit court. In any event, this Court was not able to determine, on the record before it, whether Pakistani law lacked conformity with Maryland law. *Id.* at 535, 638 A.2d at 1191.

The problem that this Court faced in *Malik I* was that the record did not even disclose whether a court in Pakistan, in a child custody dispute, applied the best interest of the child standard. In remanding for evidence and a determination as to Pakistani law, this Court stated that, unless the Pakistani court did not apply the best interest of the child standard, the circuit court should decline to exercise jurisdiction. *Id.* at 533–34, 638 A.2d at 1190.

In summing up, this Court said:

"If the Pakistani court's custody order was founded on principles of law that are repugnant to Maryland public policy, the Circuit Court for Baltimore County must exercise its jurisdiction. If the Pakistani court's determination was made without giving primary consideration to the best interest of the child, the circuit court must resolve this dispute by applying that standard. If the Pakistani court's determination was made on the basis of a rule of law or evidence or procedure so contrary to Maryland public policy

as to undermine confidence in the outcome of the trial, the circuit court must exercise its jurisdiction and resolve this dispute by applying Maryland law."

*Id.* at 534–35, 638 A.2d at 1191. Husband finds comfort in this Court's further statement:

"On remand, the circuit court must first determine whether the Pakistani court applied law that is in substantial conformity with Maryland law. That determination requires the presentation of evidence."

*Id.* at 536, 638 A.2d at 1191.

On remand, both parties elected to present their evidence through live witnesses at trial. *Malik II,* 108 Md.App. at 290, 671 A.2d at 991. The circuit court concluded that Pakistani law, as to custody, was in substantial conformity with Maryland law and declined to exercise jurisdiction. *Id.* at 293, 671 A.2d at 992. This Court affirmed, over a dissent. *Malik II* first considered the substantive issue and concluded, "[b]ased exclusively on the plain reading of the Pakistani court orders themselves, . . . that there was substantial competent evidence from which the circuit court could have concluded that the Pakistani courts applied the best interest standard." *Id.* at 314, 671 A.2d at 1003. Arguments advanced by the mother, based on matters of procedure and evidentiary presumption, were rejected.

The issue presented in the instant matter is analogous to the question in *Malik* of whether the Pakistani law of child custody was based on a best-interest-of-the-child standard. That is a question of substantive law that does not involve the procedures in a particular case, or whether those procedures undermined confidence in the outcome. Here, Husband, on two occasions, tendered to the court in the form of affidavits from Pakistani counsel, evidence of what he contended was the substantive law of Pakistan with respect to divorce by *talaq,* and its consequences. We accept those tenders as accurate statements of Pakistani law. Thus, any error by the circuit court in not more formally receiving evidence concerning Pakistani law is harmless. This is because, as we hold in Part

II, *infra,* the Pakistani law that Husband sought to prove is so contrary to Maryland public policy that it is not entitled to comity.

## II

The Court of Appeals spoke extensively on the law of comity in *Telnikoff v. Matusevitch,* 347 Md. 561, 702 A.2d 230 (1997). That case presented an effort to collect, in Maryland, on a judgment that was entered by the English High Court of Justice, based on a jury verdict, in a defamation action. Comity was denied because the substantive law of defamation in England, which circumscribed the defense of fair comment on a matter of public interest by a newspaper journalist, was repugnant to Maryland public policy. The Court of Appeals, in reviewing attempts by various courts to define comity, included the following statement from *Somportex Limited v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972):

> " 'Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws.' "

*Telnikoff,* 347 Md. at 574, 702 A.2d at 237.

Husband's argument in support of recognizing and enforcing Pakistani law principally rests on *Chaudry v. Chaudry,* 159 N.J.Super. 566, 388 A.2d 1000, *cert. denied,* 78 N.J. 335, 395 A.2d 204 (1978). The Chaudrys were citizens and domiciliaries of Pakistan, where they were married and their children were born and raised. The husband went to New Jersey to practice psychiatry and became domiciled there, while his wife and children remained in Pakistan, except for a two year period ending seven years before the New Jersey action was filed. Alleging abandonment, the wife sued for divorce in New Jersey and claimed, *inter alia,* an equitable distribution.

The defense was that, two years earlier, the husband had divorced the wife by *talaq*, pronounced at the Pakistani consulate in New York City, where the divorce deed was executed. When notice was sent to the wife, she contested the divorce in Pakistan and lost at the trial court and appellate levels.

The Appellate Division of the Superior Court of New Jersey, reversing a trial court grant of relief, rejected, *inter alia*, the wife's claim for an equitable distribution. It held that there was an insufficient nexus between the marriage and New Jersey, so that denial of that claim "cannot be said to offend [New Jersey] public policy." *Id.* at 577, 388 A.2d at 1006. Alternatively, the court held that an ante-nuptial agreement negotiated by her parents, *i.e.*, the marriage contract, barred an equitable distribution. The contract "could have lawfully provided for giving her an interest in her husband's property, but it contained no such provision." *Id.* at 578, 388 A.2d at 1006. There was "no proof that the agreement was not fair and reasonable at the time it was made." *Id.* The court saw "no reason of public policy that would justify refusing to interpret and enforce the agreement in accordance with the law of Pakistan, where it was freely negotiated and the marriage took place." *Id.*

Conceptually, the New Jersey court performed both jurisdictional and choice-of-law analyses. See generally A.T. von Mehren and D.T. Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach,* 81 Harv. L.Rev. 1601 (1968). Although they are interrelated, we shall consider these two grounds separately.

### A

■ It is clear that this State has a sufficient nexus with the marriage to effect an equitable distribution of marital property. The parties resided in Maryland for over twenty years. Their children were born and raised here. In addition, Wife, who seeks the equitable relief, is now a permanent resident of the United States, in Maryland. Nor do we consider that the letter from Wife's counsel to the Cantonment

Board Clifton to be the equivalent of a general appearance that conferred personal jurisdiction on that Board over the person of the Wife. The letter was a courteously phrased objection to jurisdiction, in the nature of a special appearance. Under these circumstances, this State would not be required to give preclusive effect, even under the Full Faith and Credit Clause of the United States Constitution, to the decision of the court of a sister state that purported to absolve one former spouse from any marital property obligation to the other former spouse. We refer to the concept of the divisible divorce.

In *Estin v. Estin,* 334 U.S. 541, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948), the United States Supreme Court decided that a Nevada court had no power to terminate the obligations of the husband to pay support pursuant to a pre-nuptial agreement made in New York, because the Nevada court had acquired no personal jurisdiction over the wife. A similar issue arose in *Vanderbilt v. Vanderbilt,* 354 U.S. 416, 77 S.Ct. 1360, 1 L.Ed.2d 1456 (1957). There, a Nevada court, without having obtained personal jurisdiction over the wife, divorced the parties and decreed that the husband was released from all of his matrimonial obligations. A New York court, at the suit of the wife for alimony, seized property of the husband in New York. The husband in *Vanderbilt* sought to distinguish *Estin* on the ground that there was no pre-existing, prenuptial agreement in his case. The Court held that that was not a material difference. *Id.* at 418, 77 S.Ct. at 1362, 1 L.Ed.2d at 1459. "Since the wife was not subject to its jurisdiction, the Nevada divorce court had no power to extinguish any right which she had under the law of New York to financial support from her husband." *Id.* Consequently, "the Nevada decree, to the extent it purported to affect the wife's right to support, was void and the Full Faith and Credit Clause did not obligate New York to give it recognition." *Id.* at 419, 77 S.Ct. at 1363, 1 L.Ed.2d at 1459 (footnote omitted).

*See also Randolph v. Randolph,* 67 Md.App. 577, 580, 508 A.2d 996, 997 (1986) (husband's no-fault divorce, obtained in Virginia, while divorce action was pending in Maryland, "did

not resolve any of the other issues between the parties."); *Dobbyn v. Dobbyn,* 57 Md.App. 662, 668 n. 1, 471 A.2d 1068, 1071 n. 1 (1984) (where husband, a resident of the District of Columbia, obtained District of Columbia divorce from wife, after personal service of process on wife in Maryland, the District of Columbia court lacked jurisdiction to affect property in Maryland, but could exercise jurisdiction over the *res* of the marriage); Maryland Code (1984, 2006 Repl. Vol.), § 8-212 of the Family Law Article (FL).[7]

■ In the matter now before us, the actual controversy, in the sense of justiciability, concerns a matter of preclusive enforcement of the Pakistani divorce, *i.e.,* as a bar to the equitable division of Husband's pension. Thus, it is unnecessary for us to decide whether Maryland would recognize the Pakistani divorce, as a divorce.[8] If, as in *Vanderbilt, supra,* a court in another state of the United States had adjudicated

---

7. FL § 8-212 provides:

"If an annulment or a divorce has been granted by a court in a foreign jurisdiction, a court in this State may exercise the powers under this subtitle [Property Disposition in Annulment and Divorce] if:

"(1) 1 of the parties was domiciled in this State when the foreign proceeding was commenced; and

"(2) the court in the other jurisdiction lacked or did not exercise personal jurisdiction over the party domiciled in this State or jurisdiction over the property at issue."

The circuit court's finding that Wife is a "permanent" resident of Maryland is a finding of domicile in this State.

8. A hypothetical will illustrate the distinction between recognition and enforcement. Assume two Pakistani citizens who were married in Pakistan and, after residing in Maryland for more than twenty years, divorced in Maryland in accordance with Pakistani law. The couple resolved property issues between themselves, and neither seeks a Maryland divorce in order to save money. Each former spouse then remarries in Maryland and resides with the new spouse in Maryland. Each former spouse is charged with bigamy in violation of Maryland Code (2002), § 10-502 of the Criminal Law Article. Each raises the Pakistani divorce as a defense.

In the instant matter, neither party objects to dissolution of their former marital status. The answer to the question of whether Pakistani law applies affects only enforcement of the Pakistani divorce on property rights under Maryland law.

that Husband had no obligation equitably to divide marital property, that aspect of the foreign state's judgment would not be entitled to full faith and credit. *A fortiori*, a law of a foreign country that provides for the same result, does not require enforcement by comity. *See* Annot., *"Conclusiveness as to merits of judgment of courts of foreign country,"* 46 A.L.R. 439, 440–41 (1927).

## B

Husband argues that the circuit court erroneously rejected his request for "permission to present expert testimony regarding the legal effect of the marriage contract itself[.]" Brief of Appellant at 19 n. 2. On this aspect of the case, we also accept, as accurate descriptions of Pakistani law, the opinions expressed by the Pakistani attorneys who were tendered as experts by Husband. In essence, their description is that, under Pakistani law, the distribution of property on divorce follows title, in the absence of a departure from the ordinary form of marriage contract, in order to include an express provision granting a wife some interest in property titled in the husband's name.

The marriage certificate/contract in the instant matter contains no such out of the ordinary provision. It consists of twenty-five items or questions. Questions eliciting information concerning the parties and other participants, the ceremony itself and the dower, were answered. All of the remaining items on the form, set forth below, were left blank. These were:

"16. Whether any property was given in lieu of the whole or any part of the dower, with specification of the same and its valuation agreed to between the parties:

"17. Special conditions, if any:

"18. Whether the husband has delegated the power of divorce to the Wife, if so under what conditions:

"19. Whether the husband's right of divorce in any way curtailed:

"20. Whether any documents was [sic] drawn up at the time of marriage relating to dower and Maintenance, etc., if so contents thereof:

"21. Whether the bridegroom has any existing wife, and if so, whether he has secured the Permission of Arbitration Council under the Muslim Family Ordinance, 1961 to contract another Marriage:

"22. Number and date of the Communications conveying to the Bridegroom the permission of the Arbitration Council to contract another marriage[.]"

The circuit court (Pincus, J.) made findings and conclusions concerning the marriage contract.

"According to the purported contract, each party had two witnesses and the [Wife] had a *Vakil.* [Husband] explained that the *Vakil* was a lawyer who was present to explain the terms of the contract to [Wife]. [Husband], however, was unable to prove to this Court that the *Vakil* was indeed an attorney or that he did advise [Wife] of her rights under the contract. [Wife] testified that the *Vakil* was her uncle who is a government officer. [Wife's] other witnesses to the contract were doctors. [Wife] contends that no lawyer explained the terms of the contract to her and she did not see the contract prior to that day. [Husband's] witness was unable to controvert [Wife's] testimony. Regardless, the contract only indicates that the Dower from the [Husband] to the [Wife] was deferred. There was no other agreement or waiver regarding any property in the contract.

"This Court does not purport to be an expert on Pakistani contract law. [Husband] did not properly bring any expert to testify regarding Pakistani law.[9] This Court examined the marriage certificate/contract and determined that, even

---

9. When Husband moved to dismiss, based on the Pakistani divorce, he also sought to take the deposition of Ahsan Zahir Rizvi. This was opposed by Wife, who obtained a protective order. The court (Sundt, J.) ruled that the notice of the deposition came too late and would put Wife to "an enormous hardship[.]" Inasmuch as the protective order was issued prior to the first trial, which was inconclusive, we do not rest our opinion on this procedural point.

if the contract is valid, it does not address most of the property at issue in this case. Further, [Wife] did not waive her right to any property. Under Maryland law, this Court does not find anything suspect about this contract. However, this Court similarly does not find anything of substance in this contract that would prohibit the Court from dividing the marital property."

■ Thus, the Pakistani marriage contract in the instant matter is not to be equated with a premarital or post-marital agreement that validly relinquished, under Maryland law, rights in marital property. If the Pakistani marriage contract is silent, Pakistani law does not recognize marital property. If a premarital or post-marital agreement in Maryland is silent with respect to marital property, those rights are recognized by Maryland law. Compare *PaineWebber, Inc. v. East*, 363 Md. 408, 768 A.2d 1029 (2001) (separation agreement that did not expressly refer to wife's rights as named beneficiary of husband's individual retirement account would not foreclose wife's contract claim as beneficiary). In other words, the "default" under Pakistani law is that Wife has no rights to property titled in Husband's name, while the "default" under Maryland law is that the wife has marital property rights in property titled in the husband's name. We hold that this conflict is so substantial that applying Pakistani law in the instant matter would be contrary to Maryland public policy.

We agree with the rationale of Lord Oliver in *Chaudhary v. Chaudhary*, [1985] 2 W.L.R. 350, [1984] 3 All E.R. 1017, [1985] Fam. 19, 1984 WL 282941 (CA (Civ.Div.)), a case analogous to the instant matter.

"The judge found that the wife learned of the 1976 talaq in that year or in early 1977 but that she neither sought nor agreed to the divorce and there is no finding that she accepted it as an effective divorce. She came to this country in July 1977. It may well be that her coming was influenced by her intention of making a claim upon her husband for support, but she was lawfully here and the judge found as a fact that by May 1978 she had established

a domicile of choice here. She was therefore entitled to the protection of her domiciliary law. She had moved into a house provided by her husband, and in February 1978 had commenced properly constituted proceedings here for maintenance on the grounds of desertion and wilful refusal to maintain. It is, as it seems to me, beyond doubt that the only reason for the husband's visit to Kashmir in May 1978 was to take advantage of the provision in the Act [10] which enabled him to rely upon his nationality to procure an effective divorce there without her cooperation. He too was domiciled here and there was no impediment at all to his commencing proceedings for dissolution of marriage here. Had he done so, however, he would have had to accept the corollary of ancillary proceedings for proper financial provision which, at that time, could be avoided if he could effectively divorce his wife abroad.

"In my judgment it must plainly be contrary to the policy of the law in a case where both parties to a marriage are domiciled in this country to permit one of them, whilst continuing his English domicile, to avoid the incidents of his domiciliary law and to deprive the other party to the marriage of her rights under that law by the simple process of taking advantage of his financial ability to travel to a country whose laws appear temporarily to be more favourable to him. This, as it seems to me, is precisely the sort of situation which the legislature must have had in mind in enacting the provisions of section 8(2)(b). In exercising his discretion against the recognition of the talaq pronounced in Kashmir, even on the footing that it is otherwise effective under the provisions of section 3(1), the judge was, in my judgment, quite right and I would accordingly dismiss the appeal."

[1985] Fam. at 44–45. The statutory reference to § 8(2)(b) is to the Recognition of Divorces and Legal Separations Act

---

**10.** The Muslin Family Laws Ordinance, 1961, § 1(2) provides that "[i]t extends to the whole of Pakistan, and applies to all Muslin citizens of Pakistan, wherever they may be."

1971, as amended by the Domicile and Matrimonial Proceedings Act 1973. That provision permitted a discretionary refusal to recognize a foreign country divorce on the ground that it would manifestly be contrary to public policy.

Further, the General Assembly of Maryland, when enacting the Property Disposition in Annulment and Divorce statute, FL §§ 8–201 through 8–214, expressly declared Maryland public policy. That legislation, Chapter 794 of the Acts of 1978, contains an uncodified preamble, which in relevant part states:

> "The General Assembly declares further that it is the policy of this State that when a marriage is dissolved *the property interests of the spouses should be adjusted fairly and equitably,* with careful consideration being given to both monetary and nonmonetary contributions made by the respective spouses to the well-being of the family, and further, that if there are minor children in the family their interests must be given particular and favorable attention."

1978 Md. Laws at 2305 (emphasis added).

For all the foregoing reasons we hold that the Circuit Court for Montgomery County did not err in declining to apply, under principles of comity, the law of Pakistan in determining Wife's rights in marital property titled in Husband's name.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**